USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/19/16
ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- v. -

NAVNOOR KANG and
DEBORAH KELLEY,

          Defendants.

- - - - - - - - - - - - - - - - x

**SEALED INDICTMENT**

16 Cr. ____

**16 CRIM 837**

**COUNT ONE**
(Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Relevant Individuals and Entities

1. At all times relevant to this Indictment, the New York State Common Retirement Fund ("NYSCRF" or the "Fund") was a pension fund administered for the benefit of public employees of the State of New York. The third largest pension fund in the United States, the NYSCRF held approximately $184 billion in assets in trust for a total of more than one million retirees and other beneficiaries. During fiscal year 2015, the NYSCRF paid out approximately $10.9 billion in retirement benefits.

2. At all times relevant to this Indictment, the NYSCRF was administered by the New York State Comptroller, New York State's chief fiscal officer. The New York State Comptroller, the NYSCRF's sole trustee, appointed directors and investment officers to make investment decisions on behalf of the NYSCRF

and its members and beneficiaries. The directors and investment officers owed a fiduciary duty to make investment decisions in the best interests of the NYSCRF and its members and beneficiaries, without any conflict of interest and free of self-dealing.

3. From in or about January 2014 through in or about February 2016, NAVNOOR KANG, the defendant, served as Director of Fixed Income and Head of Portfolio Strategy for the NYSCRF. In that capacity, KANG was responsible for investing more than $53 billion in fixed-income securities and was entrusted with discretion to manage those investments on behalf of the NYSCRF. KANG owed a fiduciary duty to the NYSCRF and its members and beneficiaries, and was required to make investment decisions in their best interests.

4. From in or about 2012 through in or about September 2015, DEBORAH KELLEY, the defendant, was Managing Director of Institutional Fixed Income Sales at a New York, New York-based broker-dealer ("Broker-Dealer-1").

5. From in or about 2013 through in or about 2016, Gregg Schonhorn was Vice President of Fixed Income Sales at a New York, New York-based broker-dealer ("Broker-Dealer-2").

6. DEBORAH KELLEY, the defendant, and Gregg Schonhorn were each responsible for executing fixed-income trades, including the purchase and sale of corporate and municipal

bonds, on behalf of their respective clients, including the NYSCRF. KELLEY and Schonhorn earned commissions based upon the fixed-income trades that they executed.

### Overview of the Scheme

7. At all times relevant to this Indictment, NAVNOOR KANG, the defendant, occupied a managerial position of trust at the NYSCRF. KANG was directly responsible for managing billions of dollars in fixed-income investments on behalf of the NYSCRF and its members and beneficiaries. KANG reported to and had access to the NYSCRF's top officials, including the chief investment officer and the New York State Comptroller.

8. From in or about 2014 through in or about 2016, NAVNOOR KANG and DEBORAH KELLEY, the defendants, Gregg Schonhorn, and others known and unknown, participated in a scheme to defraud the NYSCRF and its members and beneficiaries, and to deprive the NYSCRF of its intangible right to KANG's honest services. The scheme involved, among other things, an agreement among KANG, KELLEY, Schonhorn, and others to pay KANG bribes, in the form of entertainment, travel, lavish meals, prostitutes, nightclub bottle service, narcotics, luxury gifts, and cash payments, among other things, in exchange for fixed-income business from the NYSCRF. Such bribes, which were strictly forbidden by the NYSCRF, were paid secretly and without

any disclosure to the NYSCRF and its members and beneficiaries concerning the conflicts of interests inherent therein.

9. In exchange for the bribes paid by DEBORAH KELLEY, the defendant, Gregg Schonhorn, and others, NAVNOOR KANG, the defendant, used his position as Director of Fixed Income and Head of Portfolio Strategy at the NYSCRF to promote the interests of KELLEY and Schonhorn, and their respective firms, Broker-Dealer-1 and Broker-Dealer-2. Among other things, KANG, in exchange for the bribes he received, agreed to steer fixed-income business to Broker-Dealer-1 and Broker-Dealer-2. In fact, KANG steered more than $2 billion in fixed-income business to Broker-Dealer-1 and Broker-Dealer-2, from which KELLEY, Schonhorn, and their respective employers earned millions of dollars in commissions from the NYSCRF. In so doing, KANG, with the knowledge and approval of KELLEY and Schonhorn, breached his fiduciary duty to make investment decisions in the best interest of the NYSCRF and its members and beneficiaries, and free of conflict, and deprived the NYSCRF of its intangible right to KANG's honest services.

### Applicable Statutes, Regulations, and Policies

10. In or about 2007, in response to a "pay-for-play" corruption scandal involving a former New York State Comptroller and his staff, a special inspector general was appointed to oversee the NYSCRF, and the NYSCRF instituted a written "Code of

Conduct." At all times relevant to this Indictment, the NYSCRF Code of Conduct "establishe[d] standards of conduct for the management of . . . the [NYSCRF]. These standards [were] intended to assure that the following principles appl[ied] to," among other things, "the conduct of the business . . . of the [NYSCRF], [and] the officers and employees of the Office of the State Comptroller with responsibility for matters relating to . . . the [NYSCRF]," including that (a) the NYSCRF "shall adhere to and be managed in accordance with the highest ethical, professional and conflict of interest standards," and (b) "actions on behalf of . . . the [NYSCRF] shall be for the sole benefit of the Retirement System's members, retirees and beneficiaries." The NYSCRF Code of Conduct strictly prohibited NYSCRF employees, including NAVNOOR KANG, the defendant, from "receiv[ing] any consideration from [a] party . . . in connection with a transaction involving the [NYSCRF]."

    11. The NYSCRF Code of Conduct was consistent with parallel prohibitions in both New York's Public Officers Law and New York's Code of Rules and Regulations, which applied to NAVNOOR KANG, the defendant. New York Public Officers Law § 73(5)(a) provides, in pertinent part: "No . . . state officer or employee . . . shall, directly or indirectly . . . solicit, accept or receive any gift having more than a nominal value, whether in the form of money, service, loan, travel, lodging,

meals, refreshments, entertainment, discount, forbearance or promise, or in any other form, under circumstances in which it could reasonably be inferred that the gift was intended to influence him or her, or could reasonably be expected to influence him or her, in the performance of his or her official duties or was intended as a reward for any official action on his or her part. No person shall, directly or indirectly, offer or make any such gift to . . . any state officer or employee . . . under such circumstances." N.Y. Public Officers Law § 73(5)(a). The term "state officer or employee" is defined, in relevant part, as: "officers and employees of state departments, boards, bureaus, divisions, commissions, councils or other state agencies other than officers of such boards, commissions or councils who receive no compensation or are compensated on a per diem basis"; and "members or directors of public authorities, other than multi-state authorities, public benefit corporations and commissions at least one of whose members is appointed by the governor, who receive compensation other than on a per diem basis, and employees of such authorities, corporations and commissions." N.Y. Public Officers Law § 73(1)(g).

12. Title 19, New York Code of Rules and Regulations, Part 933 gives further effect to the statutory provisions contained in N.Y. Public Officers Law § 73. Part 933 provides, in pertinent part, that it is "presumptively impermissible" for a

New York State employee to receive any "gift" from an "interested source." 19 N.Y. C.R.R. § 933.3(a). Part 933 further provides, in pertinent part, that such a gift "is only permissible if, under the circumstances, all of the following criteria are met": (1) "it is not reasonable to infer that the gift was intended to influence [the New York State employee]; (2) "the gift could not reasonably be expected to influence the [New York State employee] in the performance of his or her official duties; and (3) "it is not reasonable to infer that the gift was intended as a reward for any official action on [the New York State employee's] part." 19 N.Y. C.R.R. § 933.3(a). The term "interested source" is defined to include "any person or entity who on his or her own behalf, or on behalf of an entity," "negotiates with, appears before in other than a ministerial matter, seeks to contract with or has contracts with, or does other business with . . . the State officer or employee, in his or her official capacity" or "the State agency with which the State officer or employee is employed or affiliated." 19 N.Y. C.R.R. § 933.2(l).

13. In or about 2014, NAVNOOR KANG, the defendant, was trained on these statutory prohibitions and compliance policies and signed a certification that he was aware of and would comply with the NYSCRF Code of Conduct and New York Public Officers Law, among other rules and regulations.

14.   At all relevant times, Broker-Dealer-1 had in place a policy that restricted its employees, including DEBORAH KELLEY, the defendant, from paying for gifts or other benefits for clients (the "Broker-Dealer-1 Policy").  The Broker-Dealer-1 Policy expressly provided, in relevant part, that offering or receiving a gift or entertainment could create a conflict of interest and that "[g]ifts of anything of value and gratuities to anyone relating to the Firm's business are limited in aggregate to $100 per year per recipient."  The Broker-Dealer-1 Policy further required employees to abide by the policies and prohibitions of Broker-Dealer-1's clients and counterparties. The Broker-Dealer-1 Policy likewise provided: "[n]o bribes, kickbacks, or similar remuneration or consideration of any kind are to be given or offered to any individual, organization, government, political party, or other entity or representative thereof, for any reason whatsoever."

15.   At all relevant times, Broker-Dealer-2 had in place a substantially similar policy.

16.   From at least in or about 2014 through in or about 2016, DEBORAH KELLEY, the defendant, and Gregg Schonhorn each signed certifications that they were aware of their firms' respective compliance policies and their responsibility to comply with these policies.

## The Scheme to Steer NYSCRF Fixed-Income Business in Exchange for Secret Bribes

17. In or about February 2014, shortly after NAVNOOR KANG, the defendant, joined the NYSCRF, KANG advised Gregg Schonhorn that the NYSCRF did not allow KANG to receive any entertainment or benefits, and that Schonhorn could not disclose any entertainment with KANG on Broker-Dealer-2 expense reports. Nevertheless, beginning in early 2014, and continuing throughout the scheme, KANG began accepting what would total more than approximately $100,000 in secret bribes from DEBORAH KELLEY, the defendant, Gregg Schonhorn, and others in exchange for steering fixed-income business to their respective brokerage firms. The brokerage firms ultimately executed a large volume of trades placed by KANG, the value of which exceeded approximately $2 billion. KANG's trades resulted in the payment of millions of dollars in commissions to Broker-Dealer-1 and Broker-Dealer-2, of which Schonhorn and Kelley personally earned approximately 35 to 40 percent.

18. For example, in or about February 2014 and April 2014, Gregg Schonhorn took NAVNOOR KANG, the defendant, on weekend trips to Montreal in exchange for NYSCRF fixed-income business. On each trip, Schonhorn paid more than approximately $10,000 for KANG's airfare, hotel, meals, nightclub bottle service, and cocaine, as well as for KANG's close associate, another NYSCRF

employee ("CC-1"), to attend and participate in certain of the outings. KANG did not disclose the trips or the benefits he received from Schonhorn, or the conflicts of interest inherent therein, to the NYSCRF.

19. By way of further example, in exchange for NYSCRF business, DEBORAH KELLEY, the defendant, paid for various expenses associated with a long-weekend trip that KELLEY and NAVNOOR KANG, the defendant, took in or about October 2014 to New Orleans, including for KANG's ticket to a Paul McCartney concert, tours, and KANG's meals. Notwithstanding that the trip violated the NYSCRF's and Broker-Dealer-1's policies, KELLEY attempted to expense costs associated with the trip to Broker-Dealer-1 and filed false expense reports at Broker-Dealer-1 omitting KANG's name. KANG did not disclose the trip, the benefits he received, or the conflicts of interest inherent therein, to the NYSCRF.

20. NAVNOOR KANG, the defendant, provided additional benefits to DEBORAH KELLEY, the defendant, Gregg Schonhorn, Broker-Dealer-1, and Broker-Dealer-2 in return for the bribes. At all relevant times, the NYSCRF had in place a formal process for approving broker-dealers to do business with the NYSCRF. At the beginning of the scheme, Broker-Dealer-1 and Broker-Dealer-2 were not on the approved list. For the purpose of circumventing this restriction, KANG orchestrated pass-through transactions

known as "step-out" trades to steer fixed-income trading business to Broker-Dealer-1 and Broker-Dealer-2. KANG arranged for Broker-Dealer-1 and Broker-Dealer-2 to broker trades for the NYSCRF through a NYSCRF-approved broker. In return, KANG arranged for the NYSCRF to pay a commission to the approved broker, which the approved broker shared with Broker-Dealer-1 and Broker-Dealer-2 without disclosure to the NYSCRF. At times, these "step-out" trades resulted in the NYSCRF paying more in commissions than it would have if it had traded directly with an approved broker, without the involvement of Broker-Dealer-1 and Broker-Dealer-2. In turn, KELLEY and Schonhorn pocketed a percentage of the commissions paid to their respective employers.

21. In or about November 2014, NAVNOOR KANG, the defendant, submitted a memorandum to his supervisor, the chief investment officer and deputy comptroller of the NYSCRF, recommending that Broker-Dealer-1 and Broker-Dealer-2, among other brokerage firms, be formally approved to do fixed-income business with the NYSCRF. In his memorandum, KANG represented that "[t]hese additional brokers will enable [NYSCRF] staff to address the immediate needs of access to additional liquidity, best execution, and more complete asset class coverage." KANG did not disclose that, by the time of this memorandum, KANG had

already received tens of thousands of dollars in secret bribes from DEBORAH KELLEY, the defendant, and Gregg Schonhorn.

22. In or about the Fall of 2014, as NAVNOOR KANG, the defendant, was arranging for Broker-Dealer-1 and Broker-Dealer-2 to receive formal approval to do business with the NYSCRF, the bribes that KANG extracted from Gregg Schonhorn escalated. Schonhorn spent thousands of dollars on KANG at strip clubs, on dinners at upscale New York restaurants, hotel reservations, bottle service at nightclubs, concerts, tickets to the U.S. Open tennis tournament, Broadway shows, and other events, and cocaine and crack cocaine. Schonhorn also handed KANG thousands of dollars in cash for KANG to pay for prostitutes, strippers, and KANG's personal expenses. Schonhorn and KANG coordinated KANG's receipt of these bribes through a smartphone application known as "WhatsApp," in an effort to keep their communications from being monitored by law enforcement.

23. In or about February 2015, in exchange for NYSCRF fixed-income business, DEBORAH KELLEY, the defendant, paid for NAVNOOR KANG, the defendant, to take a long-weekend ski trip to Park City, Utah. In violation of NYSCRF and Broker-Dealer-1's policies, KELLEY paid for, among other things, a hotel room, meals, cocktails, and ski lessons for both KANG and KANG's then-girlfriend ("Individual-1"). Notwithstanding that Broker-Dealer-1's policies prohibited such expenses, KELLEY again